## WAY ENGINEERING CO. v. WESTERN UNION TELEGRAPH CO.

### No. 8338.

Court of Civil Appeals of Texas. San Antonio.

Feb. 6, 1930.

Rehearing Denied March 12, 1930.

Matlock & Kelly, of San Antonio, for appellant.

Goeth, Webb & Goeth, of San Antonio, for appellee.

COBBS, J.

Way Engineering Company, a firm composed of W. J. Way and K. W. Way, appellant herein, filed suit against the Western Union Telegraph Company, appellee, for damages in the sum of $465.58 for failing to properly transmit a telegram paid for and filed with it by K. W. Way at San Angelo, Tex., on November 15, 1926, to be transmitted by it and delivered to appellant, W. J. Way, at San Antonio, Tex.

Appellee filed appropriate replies, and alleged contributory negligence on the part of appellant.

K. W. Way and his father, W. J. Way, constituted the firm of Way Engineering Company, engaged in the business of selling and installing refrigeration machinery and equipment. K. W. Way was the outside man. While absent from the city, he received a telegram from his father to go to San Angelo and make a deal with the McBurnett Hotel Company. He went to San Angelo as directed, and, not knowing the cost of a 600-pound ice maker, filed the following message with appellee to be transmitted to his father: "Advise list and weight six hundred pound ice maker." But appellee, not reading it correctly, wired W. J. Way: "Advise list and weight in hundred pounds ice maker." In reply thereto W. J. Way wired his son "Two Hundred Seventy-eight Dollars Beloit weight nine hundred." His son did not know the price of the 600-pound refrigerator, the wire was not quoted back to him for verification because of its doubtful meaning, but sent as requested.

W. J. Way testified:

"The price of the machine I had reference to was $278.00 and the weight was 830 pounds; that was a 100 pound ice-maker. The price of a 600 pound ice-maker was $695.-00 and the weight was 2700 pounds.

"I first discovered that we had sold a 600-pound ice-maker for the price of a 100-pound machine after my son returned and the contracts were in, and in looking over them I discovered the error. That was probably a matter of two or three days after that."

K. W. Way, the son, testified:

"I quoted that price to the McBurnett Hotel Co. for the ice maker and closed a contract with them. I sold them one of 600 pounds ice making capacity with the rest of the refrigerating equipment, which is incorporated in the contract. I sold it to them for the price of a 100-pound ice-maker. * * *

"I sold the 600 pound ice-maker for the price of a 100-pound ice maker because I had no conception of the price of that special piece of equipment, and having wired my father for the price, I received that message. * * *

"The contract was submitted to the McBurnett Hotel Company a short time after receiving the telegram from my father, and the following morning it was returned to me signed and executed by the McBurnett Hotel Company. * * *

"This is a copy of the contract that I made with the McBurnett Hotel Company.

"I would not have sold the 600 pound ice maker for the price of a 100 pound ice maker, but for this telegram that I received from my father. * * *

"The text of this original message is in my handwriting. I was in the San Angelus Hotel at San Angelo when I wrote that message. I delivered it at the desk in the hotel. * * * The first letter in the word 'six' is letter 's,' it doesn't look like capital 'I'; the 'ix' does not look to me like 'in.'

"The contract was delivered to the McBurnett Hotel Company."

O. M. Screws, a witness for appellee, testified:

"This (the telegram) was sent by the Morse system, the marks would indicate that it was. Morse telegraph code is by dots and dashes.

"As to the word 'six' in the message being transmitted as the word 'in,' there are a number of different things that might have caused that. It could have been caused by outside interference. * * * Also the copy could have been misread, on account of the illegible writing. If you knew that was 'six' it looks like 'six,' but it might be 'Lix,' a trade name of the ice-maker and it might be 'in.' It could be taken for 'six.' * * *

"I looked over these telegrams yesterday, I believe it was. I did not look over them before that. I did not make any marks on them. This message was sent with the word 'in,' that is the way it got here, it was received 'in.' In the original it looks a little like 'In.'

"As to the little marks under the words, you will find little marks like that under each word; they make them as they send the message, they send each word very carefully and

mark it, then the next word and right on down the line; they do that to keep from overlooking a word. Those marks were put on it by the sending operator.

"Some operators use little dots under the words and others make a line. They do that with a pencil as they go along. You will find marks under practically every word. Some times they skip a word, but they follow it with their left hand as they send with their right."

█ It is inconceivable to us how the telegraph company made the mistake of reading the message "ih" instead of "six" as it was written. On this point appellant wisely says in its brief: "On investigation of the original telegram delivered to the defendant for transmission it will show that the word 'six' .in the telegram is written in a plain and' legible hand, free from any marks except the little dash and dot under 'ix' in the word 'six' made by the telegraph operator when he was transmitting the telegram. It was impossible for the' operator to have mistaken the word 'six' in the telegram to be 'in.' Remove the little pencil dash under the letter 'i'. in 'six' and the little dot under the letter 'x' in 'six' placed there by the operator, and there is no possible way for a man of ordinary intelligence to construe the word 'six' as 'in' as appeared in the telegram when it reach W. J. Way. In the original telegram delivered by K. W. Way to be sent to W. J. Way there are five words beginning with the letter 'S.' If this Honorable Court will compare the letter 'S' in the word 'six' as appears in the original telegram with the other 'S's' appearing therein, you will readily see that had ·the operator who transmitted the message used ordinary diligence and care, he would have had no difficulty in transmit-, ting the telegram properly."

█ The more difficult phase of this case for us to pass upon arises in respect to the conduct of the parties after the contract for the sale of the machine was made, and while it was still in its executory state. While, as shown, before the order was filled, appellant knew of the mistake in the wire, and could have notified the hotel company of the fact, he was not compelled to do so, for fear of losing the sale.

█ K. W. Way testified that but for the wire of his father he would not have sold the 600-pound ice maker for the price of a 100-pound ice maker, and that from the telegram he received from his father he understood that was the price. The burden of proof was on appellee to show that when K. W. Way received the telegram he knew that the price and weight quoted were not in fact the price and weight of a 600-pound ice maker. W. J. Way testified:

"I, first discovered that we had sold a 600-pound ice-maker for the price of a 100-pound machine after my son returned and the contracts were in, and in looking over them I discovered the error. That was probably a matter of two or three days after that. * * *

"When my son arrived from San Angelo he brought with him this contract.

"The contract was signed in San Angelo. * * *

"I wrote a letter to the Telegraph Company and explained to them this loss that I had; at that time I tried to get a settlement with them. * * *

"I did not attempt to remedy the situation with the McBurnett Hotel Company.

"I did not do so, because we had made a contract with them, we were a business firm and we would have to fulfill our contracts, though we lost money we simply go ahead and fulfill our contracts. We would not take it up with them, regardless of the loss, we take that much pride in our business."

█ There was no evidence in the record that authorized the trial court to submit to the jury special issue No. 1, or for the jury to find that the message sent by K. W. Way to W. J. Way was an obscure message. The original message itself was introduced. If the operator had any doubt about the message, it was his duty to have called it to the attention of the sender at the time it was given to appellee. Upon its face it was not obscure, but, if so, appellee should have sought to clarify it at the time of its acceptance. Western Union Telegraph Co. v. Adams, 75 Tex. 532, 12 S. W. 857, 6 L. R. A. 844, 16 Am. St. Rep. 920; Western Union Tel. Co. v. Brown, 58 Tex. 170, 44 Am. Rep. 610.

We have carefully examined the record and considered the assignments and propositions presented thereunder, and have reached the conclusion that the court should, under the facts, have granted a new trial and reversed the judgment. The judgment is accordingly reversed and the cause remanded.